UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| TINA OXLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-cv-21-B-W |
| | ) | |
| PENOBSCOT COUNTY, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT**

This case involves a strip search conducted at the Penobscot County Jail on January 19, 2007.  The plaintiff, Tina Oxley, was arrested for operating after suspension and transported to the county jail along with a female passenger who was also arrested by the Bangor Police Department on a warrant for an unpaid fine.  Oxley has sued Hannah Kelleher[1], the corrections officer who conducted a strip search of her after she arrived at the county jail, and Glen Ross, the Sheriff of Penobscot County, and Penobscot County itself, alleging that all three parties have violated her constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution.  Kelleher and the Penobscot County Defendants have separately moved for summary judgment.  (Doc. Nos. 36 & 44.)  I conclude that a question of fact exists regarding the "reasonableness" of Penobscot County's municipal policy or custom giving rise to this full body search of a misdemeanor traffic violation arrestee who remained at the jail facility less than two hours before being released on personal recognizance and who was never placed in a cell or other detention location outside of the booking and holding area.  I recommend that summary

---

[1] Apparently Kelleher's last name is now Simpson.  The Defendants consistently refer to her as Hannah Simpson in their pleadings.  I have used the name Hannah Kelleher throughout to remain consistent with the docket.

judgment be granted as to Ms. Kelleher solely on the basis of qualified immunity and denied as to Penobscot County and its Sheriff in his official capacity.  Because there is no evidence to support a claim of personal supervisory liability against Sheriff Ross, I recommend that judgment enter in his favor to the extent he is sued in his personal capacity.

### UNDISPUTED MATERIAL FACTS

My initial recitation of undisputed facts is taken almost verbatim from the Penobscot County defendants' first sixty-four paragraphs of uncontested material facts as these sixty-four paragraphs were admitted without qualification by Oxley.

Sometime shortly before or just after midnight on the evening of January 18-19, 2007, a vehicle operated by Tina Oxley was stopped by City of Bangor police officers.  Thomas Lynch, Ms. Oxley's boyfriend, was in the front passenger seat.  Renee Hughes, one of Oxley's friends, and Renee Hughes's mother, Terry Sands, were in the back seat of the vehicle.  All of the vehicle's occupants were asked to exit the vehicle and the police ran identification checks on all of them.  The Bangor police were aware that Mr. Lynch was currently on bail for possession of drug charges and had recently been arrested for possessing a firearm.  During the stop the police searched the car and brought canines to the scene that sniffed the car.  Lynch and Sands were not arrested and left the scene.  Oxley was arrested for operating after suspension and Hughes was arrested for failure to pay a fine.  Both were pat-searched at the scene, handcuffed, placed in the back seat of the same police cruiser, and transported to the Penobscot County Jail by Officer Pelletier.  During the ride Oxley and Hughes had a conversation in the back of the cruiser. (County Defs.' Statement ¶¶ 1-14, Doc. No. 37.)

Oxley and Hughes arrived at the Penobscot County Jail at approximately 12:45 a.m. Upon arrival, Oxley's handcuffs came undone by themselves.  Both women were pat-searched by

Corrections Officer Hannah Kelleher.  During the pat-search of Hughes, Officer Kelleher found a baggie of white powder in a side pocket in Hughes' pants.  After the pat-searches, Oxley and Hughes sat down on a bench in the booking area.  After finding the baggie, Officer Kelleher gave the baggie to another corrections officer who spoke with the arresting officer, Steve Pelletier, to let him know that they had found a baggie of white powder on Ms. Hughes.  Pelletier tested the baggie with a residue swab and it came up positive for cocaine.  Hughes was charged with possession of cocaine and subsequently pled guilty to that charge.  Officer Pelletier told Kelleher to strip search both Hughes and Oxley.  Before strip searching Oxley and Hughes, Kelleher got permission from her superior officer, Sgt. Pomeroy, to do the strip search.  (Id. ¶¶ 15-25.)

Hughes was strip searched first.  She was taken to a bathroom and the door was shut before the strip search.  Officer Kelleher and another female corrections officer conducted the search and nothing was found.  After the strip search of Hughes, the female officers took Oxley to be strip searched.  Oxley was told that she was being strip searched because they had just found a white powdery substance on Hughes.  The bathroom door was closed during Oxley's strip search.  During the strip search Oxley took off one piece of clothing at a time and the officers inspected each piece of clothing.  Oxley says she had difficulty removing her bra and the corrections officers assisted her in removing the bra.  Oxley was not wearing any other underwear at the time she was strip searched.  During the strip search, Oxley had to bend over and cough, spread her buttocks apart, lift her breasts, open her mouth, and remove clips from her hair.  Oxley says the officers assisted her in removing her hairclips because she had numerous tiny clips in her hair.  Oxley does not complain about being inappropriately touched by the corrections officers during the strip search.  According to Oxley, Kelleher was professional and

respectful.  After the strip search, Oxley was allowed to put her clothes back on and was brought back out into the booking area where her fingerprints and picture were taken and she was asked booking questions.  She remained in the non-secure holding area, a part of the booking area.  The non-secure holding area does not have cells.  It is an open area with chairs.  Arrestees in this area can have contact with other inmates or arrestees.[2]  While Oxley was in the booking area, another arrestee was brought into the jail.  Hughes remained in the booking area until released later that day.  Oxley was released on personal recognizance at approximately 2:00 a.m. that morning.[3] (Id. ¶¶ 26-44.)

Glenn Ross has been the Sheriff of Penobscot County since October of 2002.  As the Sheriff, he is the final decision maker for the Penobscot County Jail and is responsible for all policies and procedures at the jail.  Captain Richard Clukey had been the Jail Administrator since 2003 and is responsible for the day-to-day operation of the jail.  (Id. ¶¶ 45-49.)

In 2004 the jail staff, including Captain Clukey and a team of other officers, undertook a major revision of the jail's policies and procedures regarding searches.  Penobscot County Jail has an official policy and procedure regarding search procedures, Policy and Procedure D-220, effective March 1, 2006.  Policy and Procedure D-220, in effect as of the date this incident, provides in pertinent part:

13)  Strip searches may only be conducted during the intake process when a minimum of one of the following conditions have been met:

a)  Search warrant has been obtained;

b)  The person is arrested for, or charged with, any crime involving violence (a) resulting in serious physical injury, or (b) with the use of a weapon or instrument of any sort, or; drugs, or other contraband or;

---

[2]    There is no evidence to suggest Oxley came into contact with any inmates.
[3]    Oxley was at the jail facility for approximately one hour and fifteen minutes.

c) IRAS that the inmate is concealing weapons, drugs, or other contraband;

d) The inmate consents to a search upon request. Consent searches shall be documented on Form D-220.3, "Consent to Search Form." Consent can be withdrawn at any time by the inmate, and will be documented.

e) If an inmate is taken into custody for execution of sentence or is already an inmate of another detention facility where the inmate has had opportunity for, or has actually had, contact with any person outside the jail facility in advance of being taken into custody into the receiving jail facility.

f) When the inmate is a "return" to this facility, i.e., another agency, I.N.S., U.S. Marshals, the Shift Supervisor will ensure that a strip search is conducted on returning inmates prior to the inmates going back to their assigned housing area, but only under circumstances where the inmate has had the opportunity for, or has actually had, contact with a person from outside of the jail facility in advance of being taken into custody into the jail facility.

14)   Reasonable suspicion may be based on such factors as the nature of the offense for which the person is arrested, the nature of offense(s) for which the person has been previously arrested, and the arrestee's appearance and conduct.

(Id. ¶ 52.)  The acronym IRAS stands for Individualized Reasonable Articulable Suspicion and is

defined in Policy D-220 in the following way:

An objectively developed suspicion in the mind of an officer that criminal conduct or a civil violation has occurred, is occurring, or is about to occur. A suspicion objectively developed that can be verbally stated or written in such a manner as to convey the suspicion to a third party. Entry required on Form D-220-1 & attachment 3 of this policy.

(Id. ¶ 53.)  The policy further states that:

All clothing and strip searches will be performed in private and in the least embarrassing manner possible. Every effort will be made to prevent any contraband from entering/remaining in the facility.

(Id. ¶ 54.)

5

Ms. Oxley admits that Sheriff Ross did not have any involvement in the alleged strip search of Tina Oxley conducted on January 19, 2007, either by participation, direction, supervision, or even passive knowledge. He first learned of this strip search in July 2007 when he received notice of Ms. Oxley's claim. (Id. ¶¶ 56-57.)

Raymond J. Sabbatine is the Defendants' expert in the field of jail administration. Mr. Sabbatine opines, and Ms. Oxley agrees, that contraband is anything that may pose a threat to the broad jail population, including inmates, staff, visitors, and others. These items can include instruments of assault, instruments of self-harm, escape instruments, barter contraband, drugs, firearms, and many other more common items such as pens, paper clips, chewing gum, or feminine hygiene pads. There is a significant risk that contraband may be brought into a correctional facility by an inmate through the "intake" process. Hence, the process of admitting a new inmate to a correctional facility requires a concerted effort to prevent the introduction of contraband into the facility. (Id. ¶¶ 58-64.) Sabbatine opines that "the fact that an inmate is charged with a non-violent or non-drug related offense does not make it less likely that the individual will possess contraband." (Id. ¶ 68.) He also opines that strip searches are the most effective means of intercepting and deterring the introduction of contraband into correctional facilities, particularly when used in connection with other search techniques, and that the nature of the crime with which an individual is charged may make it more likely that the individual possesses contraband. (Id. ¶¶ 66-67.) Ms. Oxley admits these statements.

Historically, inmates charged with traffic infractions and misdemeanors have been found to carry contraband.[4] (Id. ¶ 69.) The County Defendants offer a series of statements to the effect that contraband is a serious problem in the Penobscot County Jail and they offer some examples of incidents recorded in memos and similar records. (Id. ¶¶ 70-93.) Among those incident

---

[4] There is no suggestion that such contraband is ordinarily found in a body cavity.

reports is at least one example of a pat search of a new arrestee revealing a small amount of marijuana.  (Id. ¶ 93).  As Ms. Oxley observes in her responsive statement, most of the information involves searches of inmates.  A review of documents associated with another county jail facility, the Knox County Jail, is to the same effect, though it includes occasions in which officers have found contraband items left in common areas, such as the intake area or jail lobby.  (Id. ¶¶ 99-100).[5]

Tina Oxley offers a few statements of her own.  She states that she questioned the officers about why she was being strip searched for operating after suspension and reports that they justified the search because of something they had found on Renee Hughes.  (Pl.'s Statement of Additional Facts ¶¶ 145-146, Doc. No. 58.)  The officers informed her she could not leave the jail until she submitted to a strip search.  (Id. ¶ 147.)  Her description of the search comports with what the County Defendants describe in their statement, except that she relates her level of distress and the fact that she pleaded with the officers not to subject her to a strip search.  (Id. ¶¶ 148-151.)  The "Search Matrix" prepared in connection with Tina Oxley's visit to the Penobscot County Jail has "no further searches" circled.  (Id. ¶ 157;  Oxley Search Matrix, Doc. No. 57-4.)

---

[5]  The Defendants include the following undisputed facts in their statement of material facts, though I fail to see how these facts would change the outcome of this summary judgment dispute.  Ms. Hughes had been to the Penobscot County Jail a few times, possibly as many as ten times, prior to January 19, 2007, but she had never been strip searched before.  Lynch was charged with possession of cocaine, Class B, in December 2007 and he participated in drug court for one year and one month.  Since December 2007, Lynch was arrested three to four times for dirty urines which were a violation of drug court and a violation of probation.  On these occasions Lynch was housed overnight at the Penobscot County Jail and he was changed over into a jail uniform in front of a corrections officer.  Kursten Kill alleges she was arrested in 2001 on a domestic violence charge for which she had to stay a couple of nights at the Penobscot County Jail.  She says she was strip searched at that time and also in 2002 when she was brought to the Penobscot County Jail for violating a protection from abuse order.  In 2006, she was arrested on possession of cocaine and during a strip search two to three needles were found in her bra and a small bag of white powder was also found.  Kill also believes she may have been brought to the jail one time for failure to pay a fine, but she was not strip searched at that time.  Every time she has been strip searched it has been by a female corrections officer with the door closed behind her and she has never seen anyone else strip searched.  Donald Getchell was first convicted of a drug crime in 1991 or 1992 when he was convicted of possession of marijuana.  He says he has been strip searched every time he has gone to the Penobscot County Jail, beginning with a felony burglary arrest in 1993 and continuing through 2004.  He has been incarcerated on state and federal charges, including felony and drug offenses as well as misdemeanor crimes.  (County Defs.' Statement ¶¶ 119-138.)

The Jail utilizes a search record to document a search and why it is conducted.  The record includes a strip search log when appropriate.  Ms. Oxley's intake file did not contain such records, only the search matrix.  (Id. ¶¶ 160-162.)  The arresting officer never filled out any jail form explaining why a strip search should occur, though a form is available for arresting officers to complete.  (Id. ¶ 165.)  Ms. Oxley never mixed with the general jail population and was never placed in a holding cell or in a cell within the cell block.  (Id. ¶ 163.)  The County Defendants reply to the effect that it is true Ms. Oxley never mixed with the general jail population, but they state that she was in locations "where she could have contact with other inmates or arrestees." (County Defs.' Reply Statement ¶ 163.)  Administrator Clukey's affidavit states:

> 8.  Oxley remained in the non-secure holding area which is part of the booking area.
>
> 9.  The non-secure holding area does not have cells.  It is an open area with chairs.  Arrestees in this area can have contact with other inmates or arrestees.

(Clukey Aff., Doc. No. 37-6.)

In support of her separate motion for summary judgment, Defendant Kelleher offers certain additional statements of fact.  Ms. Kelleher notes that prior to the traffic stop Oxley was aware that she was being followed, although the record does not indicate any significant delay between this realization and the stop itself.  (Def. Kelleher's Statement ¶ 4;  Oxley Dep. at 73.) Kelleher also reports that she was aware that Ms. Oxley and Ms. Hughes were arrested together. Kelleher conducted a pat down search of both women, and found the baggie on Ms. Hughes, yet both women were thereafter allowed to be in the unsecured, open area of the booking area without being handcuffed, while Officer Pelletier ran a test on the content of the baggie. According to Kelleher, Officer Pelletier requested that she strip search both women.  (Def. Kelleher's Statement ¶¶ 19-27, Doc. No. 45.)  Ms. Kelleher asserts that she believed she had

reasonable suspicion to search Ms. Oxley based on what was found on Ms. Hughes.  (Id. ¶ 31.)
Kelleher sought and obtained permission to conduct the search from Sergeant Pomeroy, her
supervisor on duty.  (Id. ¶ 33.)  Ms. Oxley admits that it was explained to her that the strip search
was being conducted due to what was found in Ms. Hughes' pocket.  (Id. ¶ 36.)  Kelleher and her
fellow searcher conducted an unsuccessful strip search of Hughes before searching Oxley.  (Id. ¶
45.)  Kelleher states that it was jail policy "to perform strip searches of persons who were
arrested with individuals found to be carrying drugs when those persons have been in the same
proximity, such as in a vehicle" and that she was trained to follow this policy.  (Id. ¶¶ 29-30.)
Kelleher did not recall anything specific from the policy and procedures applicable to this
situation other than the fact that the policy authorized a strip search if contraband was found on
an individual.  (Kelleher Dep. at 37-38.)

DISCUSSION

A party moving for summary judgment is entitled to judgment in its favor only "if the
pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the moving
party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its
resolution would "affect the outcome of the suit under the governing law," and the dispute is
genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving
party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for
a genuine issue of material fact, the Court must view the summary judgment facts in the light
most favorable to the nonmoving party and credit all favorable inferences that might reasonably
be drawn from the facts without resort to speculation.  Merch. Ins. Co. v. U. S. Fid. & Guar. Co.,
143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for

the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Oxley's civil action is premised on the theory that the strip search of her person at the Penobscot County Jail by Hannah Kelleher was unconstitutional under the Fourth Amendment and the Fourteenth Amendment of the United States Constitution.  In addition to suing Ms. Kelleher, Oxley has sued Sheriff Ross on a theory of supervisory liability and Penobscot County on a theory of municipal liability.  All of the Defendants seek dismissal of the claims based on the undisputed facts.  I begin with the claim against Ms. Kelleher before addressing the claims against the County and the Sheriff.

**A.      Individual Officer Liability**

Defendant Kelleher argues that she is entitled to summary judgment because the undisputed facts require a ruling that it was reasonable, as a matter of law, for her to conduct a strip search and visual cavity search of Ms. Oxley based on the unknown quantity of cocaine found in the baggie in Ms. Hughes' possession.  Alternatively, she argues that she is entitled, as a matter of law, to be shielded from a claim for money damages pursuant to the doctrine of qualified immunity.  (Def. Kelleher's Mot. at 1, Doc. No. 44.)

The claim against Ms. Kelleher arises under Section 1983 of the Civil Rights Act.  This statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 enables individuals to pursue civil actions to vindicate federal constitutional and federal statutory rights when they have suffered a deprivation at the hands of a

10

state actor.   Id.  Ms. Oxley's claim is premised on an alleged violation of Fourth Amendment guarantees against unreasonable searches and seizures, as applied to the States through the Fourteenth Amendment.

Ms. Kelleher is susceptible to a Fourth Amendment claim because she was a state actor when she worked for the Penobscot County Jail and subjected Ms. Oxley to a strip search and visual cavity search while Ms. Oxley was being processed as a misdemeanor arrestee who would not ordinarily be admitted into the jail's inmate population.  Tardiff v. Knox County, 365 F.3d 1, 2 (1st Cir. 2004).  However, as an individual state actor, Ms. Kelleher is shielded to an extent by the doctrine of qualified immunity.  The Supreme Court's opinions "consistently have held that government officials are entitled to some form of immunity from suits for damages.  As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "In the last analysis, . . . qualified immunity purposes to protect government functionaries who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct."  Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999). In this way, the doctrine of qualified immunity protects a state actor from litigation in circumstances where the proper application of the underlying constitutional standard is unclear and, therefore, not otherwise suited for dismissal or summary disposition.

The qualified immunity test has two elements, but one has two facets.  The elements of the defense are:  "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)

(citing, *inter alia*, Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)).  The two facets of the second element require a court to consider:  (1) whether the contours of the right are sufficiently clear that a reasonable state actor would appreciate that his conduct was placing a constitutional right in jeopardy;  and (2) whether the officer would have understood that the right in question would actually be violated in light of the specific or concrete facts of the case.  Together, these facets of the standard address "whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."  Id.;  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.");  Saucier v. Katz, 533 U.S. 194, 201 (2001) ("This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable."), overruled in part on other grounds, Pearson, 129 S. Ct. at 820-21.

The Supreme Court has held that a court may pass over the first element of the qualified immunity analysis if consideration of the underlying constitutional question will result "in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case."  Pearson, 129 S. Ct. at 818.  That is not the case here.  Moreover, the facts of this case are not highly idiosyncratic.  It is likely that significantly similar scenarios will arise on a regular basis.  Thus, I begin my discussion with the Fourth Amendment law concerning strip searches.

### 1.   *Whether the facts make out a Fourth Amendment violation*

The practice of routinely strip searching individuals at police stations or jails has been called into question since the Supreme Court issued its decision in Bell v. Wolfish, 441 U.S. 520 (1979).  Tardiff, 365 F.3d at 2 n.1.  Since Wolfish, the First Circuit repeatedly has had occasion to issue opinions in civil cases arising from jail strip search practices.  See, e.g., Tardiff, 365 F.3d 1 (addressing class certification issues and recognizing that exposure to routine strip searches upon introduction to jail absent reasonable suspicion of hidden contraband meaningfully defines a category of plaintiffs);  Wood v. Hancock, 354 F.3d 57 (1st Cir. 2003) (vacating verdict and judgment for defendant and ordering new trial based on instructional error where plaintiff claimed unlawful strip searches in relation to jail processing on misdemeanor charges;  not involving cavity searches but involving overnight stays at jail and also involving strip searches subsequent to contact visits with counsel);  Savard v. Rhode Island, 338 F.3d 23 (1st Cir. 2003) (split-decision on qualified immunity issue involving routine strip search upon introduction to prison population);  Miller v. Kennebec County, 219 F.3d 8 (1st Cir. 2000) (involving a strip search as a component of an unreasonable, 48-hour jailhouse seizure, where there was no reasonable suspicion to support the searches and no valid basis to detain or deny bail);  Swain v. Spinney, 117 F.3d 1 (1st Cir. 1997) (involving strip search of arrestee at jail, including visual cavity inspection, after arrestee dropped baggie of marijuana on street;  summary judgment vacated because genuine issue existed as to reasonable suspicion);  Blackburn v. Snow, 771 F.2d 556, 564 (1st Cir. 1985) (involving strip search of prison visitor having contact with inmate; violation found);  Arruda v. Fair, 710 F.2d 886 (1st Cir. 1983) (maximum security inmate);  and compare Burns v. Loranger, 907 F.2d 233 (1st Cir. 1990) (strip search at premises following drug interdiction raid, performed prior to allowing use of bathroom and not involving cavity

13

search;  summary judgment granted on basis of qualified immunity because an objectively reasonable officer would believe probable cause existed).

Although the circumstances of these cases vary, the general guidelines that have developed in this Circuit over the course of the prior three decades are to the effect that misdemeanor arrestees who fail to make bail and are introduced to the inmate population as temporary detainees may be strip searched when jail personnel have an articulable, reasonable suspicion that the arrestee has contraband hidden on his or her person.  Wood, 354 F.3d at 62. However, arrestees who are taken to a facility for processing and who avoid introduction to the prison population by making bail or otherwise being released on personal recognizance remain, simply, arrestees, and they are presumed to be in a better position than those headed for the cellblock, precisely because institutional security interests do not significantly impinge upon their Fourth Amendment right to be secure against highly invasive strip searches or even more offensive cavity searches.   In this context, the First Circuit has been cautious to avoid specifically prescribing a probable cause standard as opposed to a reasonable suspicion standard, holding only that "it is clear that *at least* the reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context." Swain, 117 F.3d at 7 (emphasis added).  My reading of the cases is to the effect that arrestees subject to a temporary seizure at a jail who will not be joining the prison population are entitled to the same Fourth Amendment protection against unreasonable searches and seizures as any other arrestee, and that officers cannot manipulate the standard simply by processing or booking an arrestee at a facility that houses others for penological purposes.   I arrive at this conclusion by reading existing caselaw, beginning with Bell v. Wolfish.

In Bell v. Wolfish, although a jail practice of subjecting pretrial detainees to cavity searches following contact visits gave the justices great pause[6], 441 U.S. at 558, the Supreme Court held that such searches are not *per se* unreasonable under the Fourth Amendment under circumstances where the facility has permitted an inmate to have an unsupervised, contact visit with a non-incarcerated individual. Id. at 558-59 & n.40. Where prison strip searches are at issue, Wolfish is a foundational case. However, for present purposes it is not on point because its holding dealt, squarely, with a prison population of pretrial detainees and convicted inmates, all of whom were incarcerated pursuant to court order. Id. at 524 (describing a primary population of persons committed to ensure their presence at trial and a secondary population of convicted inmates).[7] The facility in Wolfish did not process arrestees, let alone arrestees charged with misdemeanor violations. The legitimacy of confinement for a term of weeks or months was a basic premise of the Supreme Court's opinion in Wolfish. Id. at 537 ("*Once the Government has exercised its conceded authority to detain a person pending trial*, it obviously is entitled to employ devices that are calculated to effectuate this detention.") (emphasis added) & 546 ("The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights."). The Court recognized that a variety of restraints may legitimately be imposed on the liberty of a pretrial detainee who is confined to ensure attendance at trial, id. at 538-40, but the Court also clearly recognized that different treatment presumably would be extended if the individual were someone entitled to release pending trial. Indeed, the

---

[6]    The Court's resolution of the body-cavity search issue failed to gain the support of Justices Powell, Marshall, Stevens, and Brennan. 441 U.S. at 563, 576-77, 589 n. 21, 593. Which other justices might have been lost if the cause had involved misdemeanor arrestees subjected to such searches as part of a routine booking procedure performed prior to release on personal recognizance? Because institutional security was essential to the Court's holding, the obvious inference is that none of the justices would have condoned such a routine procedure.

[7]    That Wolfish was only addressed to pretrial detainees is reflected in the Court's consideration of the Due Process Clause in addition to the Fourth Amendment. 441 U.S. at 536-37. There is no due process claim in this case.

Court's caution that "wide-ranging deference" be accorded to prison administrators, id. at 547, was tethered directly to the performance of the pretrial detention, or confinement, function, id. at 545-47, not to the performance of arrestee processing.   In its discussion of the Fourth Amendment, the Court held that the "unique" characteristics of a detention facility make it reasonable, as a general proposition,[8] to strip search a pretrial detainee subsequent to a contact visit in order to deter smuggling.   Id. at 559-60.   Ultimately, Wolfish is not on point with this case.[9]  Nevertheless, the standard that the Wolfish Court applied governs the instant scenario as much as any other.   That standard "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails," involving consideration of "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."   Id. at 559.

---

[8]        In footnote 40, the Supreme Court expressly tied its holding to the fact that the cavity search was imposed "as an alternative to close and constant monitoring of contact visits to avoid the obvious disruption of the confidentiality and intimacy that these visits are intended to afford."  441 U.S. at 559 n.40 (allowing that "[a]nother alternative that might obviate the need for body-cavity inspections would be to abolish contact visits altogether," but avoiding the issue of whether pretrial detainees have a right to contact visits).  Moreover, the Court made plain that it was addressing the issue in a generalized fashion.  Thus, it explained:  "But we deal here with the question whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted *on less than probable cause*.  Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can."  Id. at 560 (first emphasis in original, second emphasis added).  Wolfish was a class action that had resulted in broad-ranging injunctive relief and, consequently, called for a categorical approach to certain issues.  Id. at 523.  It is simply wrong to argue that the Wolfish Court broadly precluded any civil actions arising from strip searches performed on arrestees in a prison building, as the County Defendants appear to be arguing.

[9]        The County Defendants appear to agree, albeit for different reasons.  (County Defs.' Mot. at 8-15.)  The other decision that the County Defendants chiefly discuss, Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008), is also off point due to its focus on pretrial detainees.  In Powell, the plaintiffs were subjected to strip searches "because they were entering the general population of inmates at the detention facility."  Id. at 1300.  See also id. at 1302 ("The security needs that the Court in *Bell* found to justify strip searching an inmate re-entering the jail population after a contact visit are no greater than those that justify searching an arrestee when he is being booked into the general population for the first time.") & 1311 ("These reasons support the expert opinion of jail administrators that all of those who are to be detained in the general population of a detention facility should be strip searched when they enter or re-enter it.").  The County Defendants expend most of their effort arguing that pretrial detainees have no Fourth Amendment rights without ever explaining why Ms. Oxley should be regarded as a pretrial detainee.  Frankly, it is as though they are arguing a different case.  They also appear to argue that an arrestee does not have a legitimate expectation of privacy in relation to her naked form or in relation to a cavity inspection, which is utterly preposterous.  (County Defs.' Mot. at 10, citing Hudson v. Palmer, 468 U.S. 517, 524-526 & n.6 (rejecting the idea that a prisoner has a legitimate expectation of privacy with respect to personal effects within the confines of a prison cell and thereby holding that the Fourth Amendment is inapplicable to prison cell "shakedown" searches).)

More recently, the First Circuit has expressly applied the reasonable suspicion standard to a strip search ("clothing search") conducted on a misdemeanor arrestee who failed to make bail and was, consequently, assigned to a jail housing unit.  Wood, 354 F.3d at 59-60.  Subsequent to admission of the arrestee to the housing unit, jail staff conducted another search following a contact visit with an attorney, although that search included a visual cavity inspection.  Id. at 61. The First Circuit upheld a jury verdict to the effect that the search following the contact visit by the attorney was reasonable, explaining that the jury must have concluded that reasonable suspicion existed following the contact visit, but the Court vacated a similar verdict as to the other searches because the definition of "strip search" given in the trial court's  instructions required the jury to find that the search was deliberate and that it included examination of the mouth and armpits, when circuit precedent required only visual inspection of the naked body.  Id. at 63 ("Unquestionably, the serious intrusion stems from exposing one's naked body to official scrutiny;  the impact of that forced nudity is undervalued if focused attention on the mouth and underarms is also required to reach the threshold of a strip search.").[10]  As to the visual inspection searches, the First Circuit held that instructing the jury to consider the officer's subjective intent was erroneous, as was instructing the jury to consider whether the officers inspected specific areas of the body.  Id. at 63-64.  As to the post-contact-visitation search, the First Circuit held, among other things, that the issue was properly charged to the jury and that it was not erroneous to permit the jury to consider the individual facts and circumstances of the plaintiff's case, notwithstanding the fact that jail policy was not unconstitutional where it called for strip searches following contact visitations.  Id. at 69.  The point observed by the First Circuit was that "atypical circumstances" might make application of such a policy unreasonable.  Id.

---

[10]     The First Circuit recognizes that searches involving exposure of body cavities are more intrusive than mere visual inspection of the naked body.  Wood, 354 F.3d at 63 n.9.

In the same year as it decided <u>Wood</u>, the First Circuit also addressed <u>Savard v. Rhode Island</u>, 338 F.3d 23 (1st Cir. 2003) (en banc).  In <u>Savard</u>, the justices considered the qualified immunity defense.  The Court was evenly divided on the immunity issue.  In the language of the lead concurrence—those justices who opined, like the district judge, that qualified immunity existed—the question was phrased as follows:  "whether the law was clearly established . . . that prison officials need at least reasonable suspicion before subjecting misdemeanant arrestees to strip searches *when introducing them into the general population* . . . and whether a reasonable prison official . . . would have understood at that time that [such a] policy . . . transgressed the Constitution."  <u>Id.</u> at 27 (emphasis added).  These justices clearly indicated that introduction to the general population was a basic premise of their opinion.  Indeed, in their discussion of <u>Swain v. Spinney</u>, they observed that the distinction "between detaining an arrestee in virtual isolation and introducing an arrestee into the general population of a maximum security prison" was an "important" one.  <u>Savard</u>, 338 F.3d at 29.  Even still, they expressed hesitation at the idea of subjecting a misdemeanor arrestee to a mandatory strip search prior to introducing him to the general population.  <u>Id.</u> at 30.  Moreover, these justices recognized that institutional security cannot be valued like a trump card, observing that the security concerns existing at a facility should be considered in light of the actual conditions in the facility and not some presumptive concern having a predetermined value.  <u>Id.</u> at 30-31.  Thus, "detentions in local jails and police stations" are likely different from "detentions in a maximum security prison."  <u>Id.</u> at 30.  Indeed, these justices opined that such distinctions could well be regarded as "pivotal" insofar as legitimate penological interests are concerned.  <u>Id.</u> at 31.  The justices who concurred in the "dissenting" opinion in <u>Savard</u> began with an observation that strip searches involving cavity searches "are 'perhaps the greatest personal indignity searching officials can visit upon an

individual.'"  Id. at 34 (internal quotation marks omitted) (quoting Blackburn, 771 F.2d at 564).

Reviewing First Circuit precedent, they explained why they read the case law as requiring

reasonable suspicion to justify a strip search.  Id. at 35 (citing Wood v. Clemons, 89 F.3d 922

(1st Cir. 1996)).  They also observed that, where an arrestee heading into the prison population is

concerned, reasonable suspicion *minimally* applies.  Id. at 36 (quoting Swain, 117 F.3d at 5 ("A

strip and visual body cavity search of an arrestee must be justified, *at the least*, by a reasonable

suspicion.") (emphasis added).   Like the other justices, these justices also emphasized the

significance of the fact that the plaintiff was introduced to the inmate population.   Id. at 37

(contrasting the facts of Swain, in which the plaintiff "was held alone in a single cell").[11]

Ultimately, like Wolfish and Wood, Savard, too, is not squarely on point.   However, Savard

reinforces the notion that an arrestee is in a preferred position in relation to Fourth Amendment

rights when she will not be joining the prison population.   Savard is also instructive because the

justices were evenly divided on the qualified immunity question despite the fact that the prison

facility at issue in the case was a maximum security facility and the plaintiff there was moved

into the inmate population.

For purposes of the instant case, the most applicable precedent is Swain v. Spinney.  In

Swain, the plaintiff was arrested and taken to a police station based on an officer's observation

that she had dropped a baggie of marijuana on the ground during the course of a traffic stop.  117

F.3d at 3.  Officers booked, fingerprinted, and photographed the arrestee and detained her for a

short while alone in a cell.   Id.   The department supervisor ordered a strip search that was

conducted by a female employee.   Id. at 4.   The ensuing strip search included a visual cavity

search.   Id. at 4.   The First Circuit vacated an order granting summary judgment to the

---

[11]      These justices also observed that an arrestee actually presents a reduced risk of contraband smuggling
because his or her arrest and introduction to jail is ordinarily an unplanned event.   Savard, 338 F.3d at 38.

supervising officer who ordered the search and the station employee who conducted the search, finding that clearly established law required "*at least* a reasonable suspicion to conduct these types of searches," and that it was for the jury to decide whether reasonable suspicion justified the search.  Id. at 5.  The First Circuit began its discussion by referencing the standard governing searches made pursuant to a lawful arrest.  It relied on authority to the effect that a "full body search" of an arrestee is reasonable if conducted pursuant to an arrest, but that "all possible searches of an arrestee's body" are not automatically permissible and must be measured against a standard of reasonableness under the Fourth Amendment.  Id. at 6 ("A strip and visual body cavity search thus requires independent analysis . . . .").  For the applicable standard, the First Circuit referenced the balancing test set forth in Bell v. Wolfish, *viz.*: "a balancing of the need for the particular search against the invasion of personal rights that the search entails," including consideration of "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  Id. (quoting Wolfish, 441 U.S. at 559).  Given the extreme nature of the invasion of privacy that attends a visual cavity search, the First Circuit concluded that "*at least* the reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context."  Id. at 7 & n.1 (emphasis added) (noting authority to the effect that "absent a threat to institutional security," probable cause might be the standard and walking away from its own, more permissive opinion in United States v. Klein, 522 F.2d 296 (1st Cir. 1975)[12]).

Turning to the parties' arguments, Ms. Kelleher maintains that the undisputed facts cannot support a finding that Ms. Oxley's Fourth Amendment rights were violated.  In support of this position, Ms. Kelleher relies primarily on the fact that a baggie with cocaine residue was

---

[12]     In Klein, the Court held, in the context of a motion to suppress, that a visual cavity search was reasonable where the defendant was arrested for selling cocaine.  522 F.2d at 300 & n.2.

found in Ms. Hughes's pocket and Ms. Hughes was known to be travelling in the same vehicle as Ms. Oxley.   Based on the young women's proximity and presumed affinity, Ms. Kelleher (echoed by the other Defendants) argues that any reasonable officer would suspect that Ms. Oxley might have drug-related contraband hidden somewhere on her person.  (Def. Kelleher's Mot. at 11.)  Ms. Kelleher adds that the loose handcuff and the fact that the two women rode side by side in the back of the police cruiser heightened her suspicion.  (Id.)  (See also County Defs.' Mot. at 25-26 (echoing this perspective).)  In her opposition memorandum, Ms. Oxley focuses predominantly on issues pertaining to municipal and supervisory liability, emphasizing that she should not have been searched because she was never processed into the facility's detainee population and taking the position that jail security had no reasonable relationship to the decision to strip search her.  (Pl.'s Obj. at 5-12.)  In the course of her discussion, she flags the fact that Ms. Kelleher failed to comply with the jail policy on strip searches because she failed to make a log entry explaining the basis for the strip search.  (Id. at 8, 12, 18.)   Ms. Oxley also flags the fact that she was not in the position of someone who would be introduced to the general prison population.  (Id. at 18.)  Other than these two facts, Ms. Oxley does not do a good job of discussing the facts of her case in relation to a basic Fourth Amendment reasonableness standard, evidently assuming that a strip search was utterly out of the question unless and until there were grounds to treat her as an inmate rather than an arrestee.  Despite this shortcoming in her memorandum, I conclude that the facts of this case raise a genuine issue of reasonableness for the fact finder to consider and that therefore a constitutional violation could be found on these facts.

The undisputed facts of this case reflect a reasonable basis to *suspect* that the pat down searches of Ms. Oxley might have missed some small item of contraband hidden in her clothing.

However, a reasonable fact finder could also conclude that there was no reasonable basis to suspect that Ms. Oxley had any reason or opportunity to hide contraband in a body cavity.  Ms. Oxley was taken into custody without any advance warning.  She was driving the vehicle at the time of the stop, an activity that would make it difficult to simultaneously hide contraband in a private body cavity.  Drug-sniffing dogs went through the car without detecting anything.  One occupant was on bail for drug-related charges but was released subsequent to the traffic stop because there was no cause to detain him following the roadside searches.  Ms. Oxley rode in the police cruiser.  A handcuff came loose at the jail, but Ms. Oxley had been seated through the transport.  The Court would have to draw an unreasonable inference in favor of the Defendants to suggest that Ms. Oxley had a chance to move contraband into a body cavity during the transport.  Even if the fact finder could draw such an inference following trial, inferences are to be drawn in Ms. Oxley's favor at this stage of the proceeding.  At the jail, Ms. Kelleher discovered cocaine on Ms. Hughes during a second pat down search.  The presence of this item in a pocket warrants an inference that Ms. Hughes had not attempted to pass off drugs on her person to another.  A strip search and visual cavity search of Ms. Hughes's person did not reveal any hidden contraband.  A reasonable fact finder could conclude that there was no reason to suspect a different result if Ms. Oxley were strip searched.  A reasonable fact finder could also conclude that Ms. Oxley's relatively brief detention did not expose the jail to a security risk. Indeed, it might be determined that this strip search was conducted at the jail exclusively for purposes of a general law enforcement investigation and that a "jail exception" was being used to that end.

The scope and manner of the invasion of Ms. Oxley's privacy was extreme; the justification thin.  Ms. Oxley's case clears the first hurdle of the qualified immunity analysis

because the facts are sufficient to make out a constitutional violation.  This is the case even if a reasonable suspicion standard is applied.[13]  To paraphrase Justice Stevens's opinion in Arizona v. Gant:  "A rule that gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no basis for believing [contraband] might be found in [a body cavity], creates a serious and recurring threat to the privacy of countless individuals."  129 S. Ct. 1710, 1720 (2009).   A reasonable fact finder could conclude that there was no good reason to suspect that Ms. Oxley had hidden contraband in a body cavity.

---

[13]     I assume solely for the sake of argument that a reasonable suspicion standard applies because a trial-worthy dispute exists even under that standard.  Unfortunately, courts have consistently blurred the issue by referencing an "at least reasonable suspicion" standard.  The indignity of the cavity search invasion exceeds by far the indignity of an arrest, yet an arrest must be supported by probable cause, as must a strip search performed pursuant to an investigatory seizure or arrest.  Burns, 907 F.2d at 236 (discussing clearly established law in connection with strip search of arrestee and speaking in terms of probable cause).  Even in the jail context, the reasonableness of a strip search is generally understood to be categorically different when it comes to individuals arrested on charges of violent felonies or drug felonies.  This categorical shift is explained in part by the increased concerns about jail security surrounding violent individuals and/or drug dealers.

Application of a probable cause standard to less intrusive searches also calls for application of that standard in regard to extremely invasive strip searches in the absence of a genuine jail security issue.  See, e.g., United States v. Ross, 456 U.S. 798, 805, 808-809 (1982) (recognizing that probable cause is required to search a vehicle for contraband); Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.  This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.").  Moreover, mechanical application of a prison exception against arrestees is no more warranted than mechanical application of a vehicle search exception against arrestees.  See Arizona v. Gant, 129 S. Ct. 1710, 1719 (2009) (rejecting a categorical approach when it comes to the roadside search of a vehicle incident to the arrest of an occupant where the intrusion cannot be justified by the circumstances); see also cf. Terry v. Ohio, 392 U.S. 1, 19 (1968) ("This Court has held in the past that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope.  The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible.") (internal quotation marks and citations omitted).

Surely it is clearly established law that individuals have a significantly higher expectation of privacy concerning their private body cavities than they do in respect to containers in their automobiles or in their clothing.  Simply to state the proposition is to establish it.  The cause needed to search a person's private body cavities, in the absence of a prison security justification, can only reasonably be characterized as probable cause.  Yet, however the standard is labeled, the cause in this case that justified Ms. Oxley's misdemeanor arrest did not suffice to automatically justify law enforcement's inspection of Ms. Oxley's body cavities, or to strip her of all her clothing, even with the later addition of the baggie found in Ms. Hughes's pocket.  These circumstances afford an opportunity for a fact finder to make a determination of whether the search was justified under a Fourth Amendment reasonableness standard, without clouding the standard up with reasonable suspicion or probable cause language.  Simply stated:  "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  Bell, 441 U.S. at 559.

### 2.   *Whether qualified immunity applies*

Ms. Kelleher argues that, even if the search did violate a constitutional right, the law was not clearly established that Ms. Oxley's circumstances would not afford a sufficient justification for conducting "a strip search," particularly because Ms. Oxley set foot in the jail building.  (Def. Kelleher's Mot. at 15-16.)  For reasons already discussed, I conclude that the law was clearly established that the extreme violation of a strip search and cavity search must be counterbalanced with a sufficiently reasonable justification.   Ms. Kelleher was as able to assess the reasonableness of her conduct on January 19, 2007, as a reasonable fact finder would be in assessing it today.  All of the strip search precedent discussed in this case was on the books and available to law enforcement to consider and it gave more than ample warning that this search of this arrestee could work a constitutional violation.  Nevertheless, it is the second facet of this prong of the qualified immunity test that provides Ms. Kelleher with protection, *i.e.*, whether the officer would have understood that the right in question would actually be violated in light of the specific or concrete facts of the case.  The explicit, clearly established Fourth Amendment standard is reasonableness.  Kelleher believed that she had a reasonable articulable suspicion to conduct the strip search pursuant to the County's policy with respect to jail searches.  Although there is a factual question about whether the circumstances justified even a reasonable suspicion, it does not follow that qualified immunity is denied simply because Kelleher's balancing of the competing factors was erroneous.  Jennings v. Jones, 479 F.3d 110, 126-27 (1st Cir. 2007) (discussing the implications of Saucier v. Katz, 533 U.S. 194, 204-205 (2001), in regard to situations in which an officer might reasonably make a mistake in the application of a reasonableness standard).

24

I am persuaded that a reasonable officer in Ms. Kelleher's position could reasonably have believed that a strip search in a private setting by officers of the same sex as Ms. Oxley would not violate the constitution because contraband was discovered on the person of Ms. Oxley's traveling companion at the jail and because Ms. Oxley was being processed in the county jail pending release on bail.  I recognize that in <u>Swain</u> the First Circuit vacated summary judgment with respect to qualified immunity.  However, the First Circuit addressed the qualified immunity issue in <u>Swain</u> prior to <u>Saucier</u> and the First Circuit has since recognized more emphatically that the existence of genuine issue of fact related to the violation of a clearly established Fourth Amendment right does not necessarily preclude the qualified immunity defense.  <u>Jennings</u>, 479 F.3d at 126-27.  The circumstances of this case placed Ms. Kelleher in an unenviable position. She was trained as a jail officer that the jail environment was relevant to the reasonableness of conducting a strip search as a matter of jail policy and she faced a situation in which one of two travelling companions had carried contraband into the jail as a consequence of an arrest and transport to the facility for processing.  A reasonable officer in her position could have believed that the jail environment and presence of contraband on Ms. Hughes was minimally sufficient to justify the search in question.

## B.      Municipal Liability

Penobscot County and Sheriff Ross, in his official capacity, are sued under a theory of municipal liability.  "Municipalities cannot be held liable for the constitutional violations of municipal employees pursuant to the doctrine of *respondeat superior.*"  <u>Welch v. Ciampa</u>, 542 F.3d 927, 941 (1st Cir. 2008) (citing <u>Monell v. Dept. of Soc. Servs.</u>, 436 U.S. 658, 691 (1978)); <u>see</u> <u>also</u> <u>Burrell v. Hampshire County</u>, 307 F.3d 1, 2 (1st Cir. 2002) (observing that suit against an official in an official capacity "is tantamount to a suit against the entity of which the official is

an agent" and there must be a claim "that the entity followed a policy or custom" that was unconstitutional).  Federal claims against a properly named municipal defendant will only be successful if that entity was responsible for an unconstitutional municipal custom or policy that caused the violation alleged.  Welch, 542 F.3d at 941.  With respect to her claims against these municipal defendants, Ms. Oxley must establish two elements:

> First, the custom or practice must be attributable to the municipality, i.e., it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989).  Second, the custom must have been the cause of and "the moving force" behind the deprivation of constitutional rights.  Id. at 1157.

Miller v. Kennebec County, 219 F.3d 8, 12 (1st Cir. 2000).  If these elements are established, municipal liability exists.  The doctrine of qualified immunity does not protect municipal entities.  Tardiff, 365 F.3d at 2.

In the present case the summary judgment record establishes that Penobscot County and its Sheriff have adopted a formal written policy regarding strip searches at the county jail.  Oxley concedes that the written policy of Penobscot County regarding strip searches complies with First Circuit constitutional norms insofar as it addresses inmates.  (Pl.'s Obj. at 11:  "The unconstitutional search of the Plaintiff was the result of a constitutional policy unconstitutionally applied.")  Ms. Oxley's observation that Jail Policy and Procedure D-220 is written in terms of potentially strip searching inmates is a reasonable reading of Section 13 of the Policy and Procedure, which is focused on searches connected with "intake" and repeatedly refers to the "inmate," including in the subsection associated with individual reasonable articulable suspicion (IRAS).  Although Ms. Oxley concedes that the written policy is constitutional with respect to inmates, Ms. Oxley also contends that there is a custom at the jail to apply the inmate strip search

26

policy to all arrestees regardless of whether they are to become members of the general inmate population.  (Id. at 13:   "Penobscot County maintains no policy [for arrestees], but unconstitutionally applies a policy related to 'inmates' to the arrestee context.")  Ms. Oxley also observes that routine application of an inmate search policy to an arrestee who will walk away from the facility evinces deliberate indifference.  (Id. at 14-15.)

I conclude that the undisputed facts are sufficient to generate a trial-worthy issue on the municipal liability claims against Penobscot County and Sheriff Ross (in his official capacity).  Although the County Defendants do not admit that the strip search policy was the moving force behind the strip search of Ms. Oxley, they do argue that institutional security overrides Ms. Oxley's expectation of privacy even though she was an arrestee entitled to release on personal recognizance.  (County Defs.' Mot. *passim* & 19:   "In this case, the strip search that was performed was necessary to ensure that contraband was not being introduced into the facility and to maintain institutional security, internal order, and discipline.")  Moreover, they have retained an expert witness and offer statements to the effect that the "intake" process was material to the manner in which Ms. Oxley was treated.  (County Defs.' Statement ¶¶ 64, 68.)  In addition to these considerations, Ms. Kelleher has testified that it was jail policy "to perform strip searches of persons who were arrested with individuals found to be carrying drugs when those persons have been *in the same proximity, such as in a vehicle*" and that she was trained to follow this broad-reaching strip search policy.  The record reflects that Ms. Kelleher's immediate supervisor agreed that she should strip search Ms. Oxley and that Ms. Kelleher was joined by another correctional officer during the strip search.  Ms. Kelleher was not just a solitary, confused officer with respect to the application of jail policy.  In addition to this evidence, the record contains a search matrix form that reflects that Policy and Procedure D-220 is uniformly applied to

27

arrestees, regardless of whether they are to be housed at the County Jail or not. Moreover, the County failed to produce a record explaining the basis for the search although policy called for the creation of such a document. The failure to make a record that the search was something other than a customary search has some tendency to support a finding that a custom was at work. Together, this evidence is sufficient to support a finding that Penobscot County has a custom of subjecting misdemeanor arrestees to strip searches and cavity searches based on a watered down reasonable suspicion standard and fails to differentiate between arrestees destined for release on personal recognizance in short order and those who are destined for placement amidst the general prison population when it comes to strip search practices.

**C.      Supervisory Liability**

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.' Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009). A plaintiff must establish "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. At 1948-49. Mere knowledge of a subordinate's alleged wrongful conduct does not establish Section 1983 liability for a supervisor absent some personal involvement in the alleged wrong by the supervisor. Rather, there must be an affirmative link between the conduct of the supervisor and the constitutional deprivation experienced by the plaintiff. See Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009); Maldonado v. Fontanes, 568 F.3d 263, 274-75 (1st Cir. 2009); Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005).

On this record there is no affirmative link between the alleged violation of Fourth Amendment rights and Sheriff Ross's actions. Consequently, I conclude that the summary judgment record is insufficient to expose him to trial in his personal capacity. The record fails to

disclose that Ross had even personal knowledge of how the written policy would be applied to Oxley and the record is silent as to whether he had personal knowledge of a custom that would subject every arrestee, no matter how long her anticipated stay at jail, to a strip search because she had been in proximity to someone else who had drugs on her person and was presently being processed in the jail for a misdemeanor arrest.  Moreover, Ms. Oxley not only failed to allege a theory of liability against Sheriff Ross based on facts other than Sheriff Ross's status as the head policy-making official, but has also admitted a statement of material fact to the effect that Sheriff Ross did not have any involvement in the alleged strip search of Tina Oxley conducted on January 19, 2007, either by participation, direction, supervision, or even passive knowledge. This record does not suffice to expose Sheriff Ross to liability on a personal-capacity claim.

## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court GRANT Defendant Kelleher's motion for summary judgment (Doc. No. 44); DENY IN PART the County Defendants' motion for summary judgment with respect to Ms. Oxley's municipal liability claim against Penobscot County and Sheriff Ross in his official capacity;  and GRANT IN PART the County Defendants' motion with respect to a supervisory liability theory asserted against Sheriff Ross personally (Doc. No. 36).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Date February 12, 2010