UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| TINA OXLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CV-09-21-B-W |
| | ) |
| PENOBSCOT COUNTY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**ORDER AFFIRMING THE
THE MAGISTRATE JUDGE'S RECOMMENDED DECISION**

Tina Oxley was arrested for operating after suspension. At the Penobscot County Jail, the police conducted a strip and visual body cavity search of Ms. Oxley after finding illegal drugs on Renee Hughes, a friend arrested with Ms. Oxley. Ms. Oxley sued Hannah Kelleher,[1] the officer who conducted the search; Glen Ross, the Sheriff of Penobscot County; and Penobscot County,[2] alleging that they violated her rights under the Fourth and Fourteenth Amendments of the United States Constitution. *Compl.* (Docket # 1).

On February 12, 2010, the Magistrate Judge recommended that the Court grant Ms. Kelleher's motion for summary judgment. *Report and Recommended Decision* (Docket # 68) (*Rec. Dec.*). The Magistrate further recommended that the Court deny the County Defendants' motion for summary judgment with respect to Ms. Oxley's municipal liability claim against Penobscot County and Sherriff Ross in his official capacity but grant the County Defendants' motion with respect to the supervisory theory of liability asserted against Sheriff Ross personally. *Id*. at 29. The County Defendants objected to the Recommended Decision on March

---

[1] The Defendants refer to Hannah Kelleher as Hannah Simpson; presumably Ms. Kelleher has changed her name. The Court uses the name Hannah Kelleher to remain consistent with the docket.

[2] The Court refers to Sherriff Ross and Penobscot County as the County Defendants.

8, 2010.  *Obj. to Report and Recommended Decision* (Docket # 73) (*Obj. to Rec. Dec.*).  Ms. Oxley responded to the objection on March 25, 2010.  *Resp. to Obj. to Report and Recommended Decision* (Docket # 74).³  On April 28, 2010, the County Defendants moved for oral argument; the Court granted the request on April 29, 2010.  *Req. for Oral Argument* (Docket # 75); *Order* (Docket # 76).  The Court held oral argument on May 24, 2010.

The Court reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record, and made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision.  The Court concurs with the recommendations of the United States Magistrate Judge for the reasons set forth in her Recommended Decision and for the additional reasons in this Order.

I.      DISCUSSION

   A.      Requests to Strike

The County Defendants argue that the Magistrate Judge erred in ignoring its requests to strike and contends that "[i]f the requests to strike were granted, the summary judgment record would be materially altered in Defendant's favor."  *Obj. to Rec. Dec*. at 2.  The Court disagrees.

The County Defendants assert that paragraph 65 was not properly denied by Ms. Oxley and should be deemed admitted; more specifically, the County Defendants contend that the "record reference did not contest or support the denial of the matter set forth in [County Defendants' Statement of Material Facts] ¶ 65."  *Id.*  Paragraph 65 of the County Defendants' Statement of Material Facts asserts their expert's opinion that

> Strip searches are appropriate when used in connection with inmates newly received at a jail, where the inmate is or has been immediately prior to arrest/incarceration in close proximity to an area where contraband is found.

---

³ Ms. Oxley did not object to the Magistrate Judge's recommendation to grant Ms. Kelleher's motion for summary judgment and to grant the County Defendants' motion for summary judgment with respect to Sherriff Ross' individual liability.  These portions of the Recommended Decision are affirmed.

*County Defendants' Statement of Material Facts* ¶ 65 (Docket # 37) (*CDSMF*). Ms. Oxley denied the statement, citing "Sabbatine Depo. Exhibit 4, p. 7." *Plaintiff's Statement of Material Facts* ¶ 65 (Docket # 58). Exhibit 4 of the Sabbatine deposition is a Jail Risk Management Manual written by Mr. Sabbatine, the County Defendants' expert. Beginning on the preceding page, the exhibit reads:

> UNLAWFUL STRIP SEARCHES
>
> The courts have tried to maintain a balance between the rights of an individual to be free from an unreasonable search and an institution's need to prohibit contraband that may pose a threat to the public or institutional safety from entering a facility. In doing so, they have established a baseline that permits the strip search of an arrestee *only* when there is *reason to believe* that the person is in possession of contraband that poses a threat to public or institutional safety. Otherwise the institution must use less invasive methods of search to detect items of contraband.

*Dep. of Raymond Sabbatine*, Ex. 4 at 6-7 (Docket # 60) (*Sabbatine* Ex. 4).

The Court identifies two ways Ms. Oxley's response is sufficient. First, by citing Mr. Sabbatine's Manual, Ms. Oxley highlights the fact that Mr. Sabbatine draws a distinction for strip search purposes between an inmate and an arrestee, a distinction the County Defendants steadfastly deny exists. Paragraph 65 addresses inmates generally; Mr. Sabbatine's Manual suggests that the standard is different for arrestees. Second, paragraph 65 suggests that a strip search is appropriate whenever a person is "in close proximity to an area where contraband is found." *CDSMF* ¶ 65. In contrast, Mr. Sabbatine's Manual restricts strip searches for arrestees to situations where the possession of contraband "poses a threat to public or institutional safety." *Sabbatine* Ex. 4 at 7. At oral argument, the County Defendants responded that Mr. Sabbatine's Manual constituted the inadmissible expression of a legal opinion by a lay witness. The question here is whether Ms. Oxley was justified in denying the paragraph based on Mr. Sabbatine's

statement and differences between paragraph 65 and the Sabbatine Manual. The Court concludes Ms. Oxley properly denied the paragraph.

Even if deemed admitted, however, the County Defendants included no statement of material fact suggesting that arrestees should be treated like inmates. Absent such information, paragraph 65 is beside the point. The Magistrate Judge was justified in not including it in her summary of relevant facts.

The County Defendants also request that Ms. Oxley's qualified responses to paragraphs 71-92, 96-98, 101-104, 106-112, and 114-118 of the County Defendants' Statement of Material Facts be stricken. *Obj. to Rec. Dec*. at 3. Generally, these paragraphs deal with inmate attempts to smuggle contraband into the Penobscot and Knox County Jails. Ms. Oxley responded with a qualified response noting that the paragraphs concern inmates, not arrestees. The County Defendants have objected to the qualified response.

The County Defendants' objections are frivolous. First, contrary to their objections, the Magistrate Judge cited most of these paragraphs, summarized them, and treated them as facts in the record. *Rec. Dec*. at 6-7. Second, Ms. Oxley did not deny the facts; she only highlighted that evidence of contraband among inmates is legally distinct from whether arrestees can be strip searched. Statements of material facts are supposed to be just that: statements of facts. They are not supposed to be arguments of law in the guise of facts. Whether the same legal standards apply to strip searches of arrestees and inmates is a matter of law. Ms. Oxley properly qualified her responses, and the County Defendants' objections to those qualified responses are ill-founded and overruled.

4

### B.     Incorrect Characterization of Record

The County Defendants contend that paragraph 117 of their Statement of Material Facts contradicts the Magistrate Judge's conclusion that, with respect to arrestees possessing contraband, "[t]here is no suggestion that such contraband is ordinarily found in a body cavity." *Obj. to Rec. Dec*. at 4 (quoting *Rec. Dec*. at 6 n.4). The County Defendants argue that "[i]n fact, the summary judgment record in this case contains precisely such evidence." *Id.* at 4. They assert that "the recommended decision incorrectly characterizes the summary judgment record regarding evidence found in body cavities." *Id.*

To support their position, the County Defendants cite paragraph 117, which describes one example of when a "sentenced inmate" charged with operating after suspension had removed contraband hidden in his body cavity in the intake bathroom. *Id.* (citing CDSMF ¶ 117). One instance, however, does not prove that such contraband is "ordinarily" found. Furthermore, although also involving a traffic violation, the incident is distinguishable because it involves a "sentenced inmate," not an arrestee. The Court overrules the County Defendants' objection because the Magistrate Judge properly characterized the record evidence.

### C.     Whether Reasonable Suspicion Existed

The County Defendants argue that the Magistrate Judge erred in finding that there was no reasonable suspicion to strip search Ms. Oxley. *Obj. to Rec. Dec*. at 5. Because the Magistrate Judge found "a reasonable basis to *suspect* that the pat down searches of Ms. Oxley might have missed some small item of contraband hidden in her clothing," the County Defendants contend that the reasonable suspicion standard is met. *Id*. at 9 (quoting *Rec. Dec*. at 21).

A reasonable suspicion of contraband in Ms. Oxley's *clothes*, however, does not necessarily translate into reasonable suspicion of contraband in her *body*. *United States v.*

*Barnes*, 506 F.3d 58, 62 (1st Cir. 2007); *Swain v. Spinney*, 117 F.3d 1, 5-7 (1st Cir. 1997) (suggesting that because a strip and visual bodily cavity search are more invasive than a strip search alone, the visual bodily cavity search requires a higher standard of suspicion).[4] In *Barnes*, the First Circuit stated that "the evidence before the police officer—that [the suspect] was a suspected drug dealer in possession of narcotics and that some drug dealers conceal drugs between their buttocks—did not endow [the police officer] with an individualized suspicion that [the suspect] was 'cheeking' drugs." *Barnes*, 506 F.3d at 62. In remanding, the First Circuit recognized that the existence of reasonable suspicion to perform a strip search did not necessarily provide reasonable suspicion to conduct a visual body cavity search. *Id.*[5]

Even if there was a reasonable basis to search Ms. Oxley's clothing, a jury could find that there was no reasonable basis to suspect that Ms. Oxley had hidden contraband in a body cavity. Before Ms. Oxley was pulled over by the police, there is no suggestion she would have had any reason to hide drugs or other contraband in a body orifice, and once she was pulled over, a jury could find that there were no reasonable grounds to suspect that she had an opportunity to do so.

---

[4] In the Recommended Decision, the Magistrate Judge concluded that there was a "reasonable basis to *suspect* that the pat down searches of Ms. Oxley might have missed some small item of contraband hidden in her clothing. However, a reasonable fact finder could also conclude that there was no reasonable basis to suspect that Ms. Oxley had any reason or opportunity to hide contraband in a body cavity." *Rec. Dec.* at 21-22. In other words, the Magistrate Judge found that the police had reasonable suspicion to conduct a strip search but not a visual cavity search. Because the Court concludes that there is a question of material fact as to whether the visual cavity search of Ms. Oxley was unconstitutional and denies the motion for summary judgment, the Court does not reach the constitutionality of the strip search.

[5] Just last year, in the context of a school, the Supreme Court addressed the difference between a search of a person's outer clothing and a strip search. *Safford Unified Sch. Dist. # 1 v. Redding*, 129 S. Ct. 2633 (2009). In *Redding*, the school officials suspected a student of bringing "forbidden prescription and over-the-counter drugs to school." *Id.* at 2637. The Court upheld the school's search of the student's backpack and outer clothing. *Id.* at 2641 (stating that "[i]f Wilson's reasonable suspicion of pill distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making"). The school officials, however, had required the student to "remove her clothes down to her underwear, and then 'pull out' her bra and the elastic band on her underpants." *Id.* The Court was troubled by this more invasive search, stating that "both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings." *Id.* Although there are obvious differences between a student and an arrestee, *Stafford*'s general principle—that a strip search is "categorically distinct" from other less invasive searches and requires "distinct elements of justification" —is consistent with the Court's analysis here.

She was taken into custody without advance warning and remained in the presence of police officers from the time she was stopped until the time she was searched. It is true that the police found drugs in the side pants pocket of Ms. Oxley's passenger, but this discovery does not meet the "reasonable suspicion" standard the First Circuit requires for a body cavity search of Ms. Oxley in these circumstances. *Id*.

The County Defendants emphasize that Ms. Oxley and Ms. Hughes were "in close proximity" both in Ms. Oxley's car and in the police cruiser and that Ms. Oxley's handcuffs were so loose that one of them fell off when she reached the jail. *Obj. to Rec. Dec*. at 6. But the County Defendants do not explain how Ms. Oxley would have been able to secrete drugs into one of her body cavities during this interval or why a factfinder would be required to find that the County Defendants had a "reasonable suspicion" that she did so. *Barnes*, 506 F.3d at 62.

### D. Fourth Amendment Rights

The County Defendants also argue that Ms. Oxley had no Fourth Amendment right to be free from strip searches and that the Magistrate Judge erred in not according sufficient deference to "correctional officials in establishing jail policy." *Obj. to Rec. Dec*. at 10. Indeed, the County Defendants have staked out what the Court views as extreme and fundamentally erroneous positions regarding the County Defendants' right to undertake a strip and visual body cavity search. First, they claim that the law recognizes no distinctions among different parts of a jail: the booking area is the same for strip search purposes as a cell. Second, they assert that the law recognizes no distinctions among types of visitors: there is no difference between an arrestee being booked on a misdemeanor and an inmate serving a sentence. Third, they contend that the law recognizes no difference among types of searches: if the County has a right to require a strip

search, they have a right to engage in a visual body cavity search.[6] None of these contentions stated emphatically as broad propositions is, in the Court's view, correct. The law requires a much more nuanced analysis, balancing the individual's right to be free from unreasonable searches and seizures against legitimate institutional security concerns.

Relying on *Hudson v. Palmer*, 468 U.S. 517 (1984), the County Defendants argue that "[t]he United States Supreme Court requires application of an 'expectation of privacy' test in order to determine whether confined persons' Fourth Amendment rights survive incarceration." *Obj. to Rec. Dec.* at 11. But *Hudson* involved prison inmates in cells, and Ms. Oxley was not incarcerated at the time of the contested search. *Hudson*, 468 U.S. at 519 (stating that the Court granted certiorari to decide "whether a prison inmate has a reasonable expectation of privacy in his prison cell entitling him to the protection of the Fourth Amendment against unreasonable searches and seizures"). The County Defendants have not explained how the "prison-based expectation of privacy test" applies to arrestees in the booking area of a county jail. *Obj. to Rec. Dec.* at 12. Furthermore, the First Circuit explicitly recognizes that a strip and visual body cavity search pursuant to arrest requires "analysis under the Fourth Amendment." *Swain*, 117 F.3d at 6. To the extent the County Defendants ask the Court not to follow clear First Circuit precedent, the Court declines.

In addition, the County Defendants argue that to successfully challenge any policy or practice, *Bell v. Wolfish* requires Ms. Oxley to "produce 'substantial evidence' that the challenged jail policy or practice limiting an established or claimed constitutional right is an 'exaggerated response' by jail administrators to perceived risks." *Obj. to Rec. Dec*. at 13 (citing *Bell v.* Wolfish, 441 U.S. 520 (1979)). The County Defendants conclude that had "the proper

---

[6] The County Defendants concede that if a digital body cavity search is to be performed, it must be done by a medical professional.

analytical paradigm [been] pursued," the Magistrate Judge would have found that Ms. Oxley had not met her heavy burden. *Id*. at 20.

The County Defendants' argument runs counter to First Circuit precedent. The First Circuit describes the *Bell v. Wolfish* test as balancing the serious privacy invasion of visual body cavity searches with the legitimate needs of law enforcement. *Swain*, 117 F.3d at 6-7 (citing *Wolfish*, 441 U.S. at 558-59). For a visual body cavity search to be reasonable under *Wolfish*, the First Circuit states that there must be "at least a reasonable suspicion that the arrestee is concealing contraband or weapons." *Id*. at 7. In other words, the "reasonable suspicion" requirement already takes into consideration legitimate law enforcement needs: if the police do not have reasonable suspicion, legitimate law enforcement needs do not outweigh the privacy invasion.

Even so, the County Defendants continue to insist that case law applicable to inmates is equally applicable to Ms. Oxley. The County Defendants say that the law mandates that "the prisoner's expectation of privacy *always* yield[s] to . . . the *paramount* interest in institutional security." *Obj. to Rec. Dec*. at 13 (quoting *Hudson*, 468 U.S. at 528 (emphasis added by the County Defendants)). The County Defendants cite their Statement of Material Facts paragraphs 40 through 43, which assert that Ms. Oxley "remained in the non-secure holding area, which is part of the booking area" of the jail, that the "non-secure area does not have cells" and is "an open area with chairs," and that "[a]rrestees in this area can have contact with other inmates or arrestees." *CDSMF* ¶¶ 40-41. These facts are sufficient, they contend, to require the application of the *Hudson* standard to Ms. Oxley's case because institutional security is at stake, and the *Hudson* analysis, they assert, means that Ms. Oxley's "retention of Fourth Amendment rights remains assumed, but not established." *Id.*

9

To be sure, as the First Circuit has said, it is at the margins that "the lines are easily plotted." *Savard v. Rhode Island*, 338 F.3d 23, 28 (1st Cir. 2003) (en banc). The arrestee in *Swain* was kept in virtual isolation and "[t]here was no risk that she would come in contact with other prisoners, or be able to smuggle contraband or weapons into a secure environment." *Swain*, 117 F.3d at 8. Here, the County Defendants in effect say that as an arrestee in the booking area, Ms. Oxley was not "in virtual isolation." *Savard*, 338 F.3d at 29 (describing how Swain was held "in virtual isolation"). It is true that according to jail policy, Ms. Oxley could come into contact with inmates because some inmates are allowed in the booking area. But like Ms. Swain, Ms. Oxley was an arrestee, not an inmate, and like Ms. Swain, Ms. Oxley was not introduced into the general prison population at the jail. Also, the First Circuit draws distinctions between county jails and maximum security prisons, strip search policies being more defensible in prisons where the prison population "tends to be much more volatile and much less transient than that of a county jail." *Savard*, 338 F.3d at 31. In the context of this case, the County Defendants' reliance on jail security as a basis for strip searching an arrestee who was only briefly in the booking area is a decidedly thin reed.

The Court is dubious about whether the County Defendants' strip search of Ms. Oxley was in fact related to a security purpose. There is no evidence that Ms. Oxley was going to be subject to an extended detention, that she was ever going to be introduced into the inmate population of the jail, or that whatever limited contact she could have had with inmates provided a realistic opportunity to dispense contraband. At oral argument, the County Defendants justified Ms. Oxley's strip search by claiming that during the course of a traffic stop, people commonly hide contraband in body cavities and it is easier for females to do so. If a person with secreted contraband in a body cavity is taken to the booking area, the County Defendants argued

10

that the contraband could be removed from her body and hidden somewhere in the booking area, the contraband could later be found by a trustee, and the trustee could then distribute the contraband throughout the general prison population. The Court is deeply skeptical, starting with the notion that females frequently hide contraband in body orifices during traffic stops and ending with the assertion that contraband hidden in a body orifice by an arrestee so frequently finds its way from the booking area into the cellblock to constitute a real security concern. The County Defendants' scenario, though theoretically possible, does not justify the wholesale loss of Fourth Amendment rights for persons like Ms. Oxley who have been arrested for minor crimes.

At a minimum, on this record, Ms. Oxley has raised a genuine issue of material fact as to whether the County Defendants strip searched her due to security concerns or to see if she was carrying her own drugs or drugs Ms. Hughes passed to her after the stop.[7] The County Defendants conceded at oral argument that if Ms. Oxley's strip search was investigative, not security-based, probable cause would have been required. Ms. Oxley has raised a question of fact as to whether the County Defendants had the required level of suspicion.

## II. CONCLUSION

The Court AFFIRMS the Magistrate Judge's Recommended Decision (Docket # 68). The Court GRANTS Ms. Kelleher's motion for summary judgment (Docket # 44). The Court DENIES IN PART the County Defendants' motion for summary judgment with respect to Ms. Oxley's municipal liability claim against Penobscot County and Sherriff Ross in his official

---

[7] To the extent the County Defendants justify the strip search based on a jail policy of allowing inmates into the booking area, the Court is skeptical about whether the County can negate an arrestee's Fourth Amendment rights by allowing some degree of possible contact with an inmate. In *Blackburn v. Snow*, 771 F.2d 556, 566 (1st Cir. 1985), the First Circuit affirmed a finding of liability for a strip search performed pursuant to the jail's policy to strip search all visitors in part because "the Jail was equipped to offer screened, non-contact visits . . . in lieu of a strip search." Here, a far less drastic alternative would be to restrict or prohibit inmate access to the booking area while arrestees are being booked. At oral argument, the County Defendants strenuously contended that many county jails in Maine are not designed to allow for a separation between the booking area and the general inmate population and that the Penobscot County Jail is one of those. There is, however, no evidence in this record on this issue.

capacity (Docket # 36). The Court GRANTS IN PART the County Defendants' motion with respect to the supervisory theory of liability asserted against Sherriff Ross personally (Docket # 36).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 25th day of May, 2010